**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:08cv566-2-MU[1]**
**(3:06cr373-W and 3:07cr48-W)**

|                                |     |              |
| ------------------------------ | --- | ------------ |
| **IAN T. BARKER,**             | )   |              |
|                                | )   |              |
| **Petitioner,**                | )   |              |
|                                | )   |              |
| v.                             | )   | **O R D E R** |
|                                | )   |              |
| **UNITED STATES OF AMERICA,**  | )   |              |
|                                | )   |              |
| **Respondent.**                | )   |              |
|                                | )   |              |

**THIS MATTER** is before the Court upon Petitioner's Motion under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence, filed December 10, 2008 (Doc. No. 1); the Govern-

ment's combined Response and <u>de facto</u> motion for summary judgment, filed June 5, 2009 (Doc.

No. 4); Petitioner's Reply/Response to the Government's pleading, filed September 28, 2010

(Doc. No. 6); and Petitioner's two supplements to his Reply, filed November 24, and December

10, 2010 (Doc. Nos. 7 and 8, respectively).

## I.  FACTUAL AND PROCEDURAL HISTORY

From in or about late 2002, Petitioner, his co-defendant Donald A. Duncan, and

numerous other persons engaged in a fraudulent telemarketing scheme by which they defrauded

numerous United States citizens out of large sums of money.  (Criminal Case No. 3:06cr373,

Doc. No. 1).  Such scheme was operated from San Jose, Costa Rica, and consisted of Petitioner

and others calling persons, primarily elderly American citizens, and deceiving them into

believing that they had won large monetary prizes in sweepstakes contests.  (<u>Id.</u>).  During those

---

[1] This case originally was assigned to the Honorable Frank D. Whitney, U.S. District Judge, but recently
was reassigned to the undersigned for disposition.

conversations, Petitioner or another co-conspirator, who represented themselves as federal agents of the non-existent "Sweepstakes Security Commission," told their victims that they had to send several thousand dollars by wire or certified funds back to the Commission in order to insure the safe delivery of their sweepstakes winnings. (Id.). Petitioner's role in such scheme was either to make initial telephone contact with the intended victim in order to "pitch" the scheme, or to take over the call or contact with the victims after the victims already made initial payments as a result of the initial misrepresentations, and "load" such victims up by inducing them to send additional sums of "insurance" money for larger prizes. (Id.). The victims were never paid any prize money. (Id.).

By 2004, Petitioner and Duncan opened their own call center for the purpose of operating this scheme. (Criminal Case No. 3:07cr48, Doc. No. 14). Up until in or about May 2005, Petitioner and Duncan owned and sequentially operated their own call center from three separate locations, at which time they sold that businesses to David Hennessy for $50,000. (Id.). In August 2005, without initially disclosing their identities, Petitioner and Duncan began sending unsolicited e-mails to various federal and state law enforcement agencies. (Doc. No. 1-2). Such e-mails explained the nature of the sweepstakes scheme and reported Petitioner and Duncan's offers to cooperate in an existing investigation of such crimes. (Id.). In September 2005, Petitioner and Duncan sent an e-mail to the Costa Rican Embassy in Washington, DC, advising that they were U.S. Nationals who were concluding their investigation into fraudulent sweep- stakes schemes in Costa Rica, giving a general description of what their investigation had revealed, and inviting the recipient to contact them for further information. (Id.).

In November 2005, federal investigators, including Special Agent Jose Gonzalez of the U.S. Postal Inspector Service, went to Costa Rica to continue their own investigation of those

matters, at which time they advised Prosecutor Loewenberg that they had received an email regarding their sweepstakes fraud investigation. (Id.). The e-mail further advised the prosecutor that the anonymous e-mail to investigators made references to the sweepstakes fraud in Costa Rica; that it detailed the matters which they already were investigating; and that, due to the level of detail contained in the writer's/writers' e-mail, investigators were certain that the writer/ writers also was/were involved in sweepstakes fraud. (Doc. No. 4-6: Affidavit of Gonzalez). In fact, the information in the anonymous e-mail was corroborative of information that Agent Gonzalez's investigation already had revealed. (Id.).

Also during that time period, Agent Gonzalez opened an e-mail account and began directly communicating with the unidentified senders of the initial e-mail, Petitioner and Duncan. (Id.). After several e-mails were exchanged, Agent Gonzalez initiated telephone contact with Petitioner and Duncan in or about mid December 2005. (Id.). During such conversations, Petitioner and Duncan provided further information regarding the participants and methods used by them in the sweepstakes fraud. (Id.). As a result, Petitioner and Duncan implicated themselves in the commission of these crimes during while conversing with Agent Gonzalez by providing details that only a participant could know. (Id.). Furthermore, during those conversations, Agent Gonzalez advised that the Government's investigation was on-going and that the perpetrators of the crimes would be arrested and charged. (Id.). In turn, Petitioner and Duncan asked for immunity on the basis of their cooperation; therefore, Agent Gonzalez scheduled a conference call with them, himself and the prosecutor, Mr. Loewenberg. (Id.).

Over the course of those three-way conversations, Petitioner and Duncan admitted their own involvement in the fraudulent activities while minimizing the extent of their conduct. (Id.). Nevertheless, Mr. Loewenberg advised them that arrests and charges for all participants were

forthcoming.  (Id.) When Petitioner and Duncan asked not to be arrested or to have to re-pay the proceeds from their crimes, Mr. Loewenberg advised that before he could make any agreements about their outcomes, he would have to conduct a full, in-person debriefing with them; and that they would need to hire an attorney in order to facilitate that debriefing.  (Id.).  Petitioner and Duncan advised that they neither had an attorney nor money to hire one.  (Id.). In subsequent conversations, however, Mr. Loewenberg continued to advise them that they needed counsel and could hire anyone they desired.  (Id.).  Eventually, Duncan advised that he had an attorney in the Miami, FL area.  (Id.).  However, when Agent Gonzalez and Mr. Loewenberg called that attorney to arrange the debriefing, the attorney denied that he represented either Petitioner or Duncan.  (Id.).

During a final three-way call between Petitioner, Duncan and the authorities, Mr. Loewenberg told the men about his exchange with the Miami lawyer, and that they would be subject to arrest if an agreement was not reached by the time authorities entered that phase of their case.  (Id.).   In response, Petitioner and Duncan indicated that they were anxious to secure an arrangement in order to avoid being arrested; and that the Miami attorney had referred them to another attorney with whom they were unable to make contact.  (Id.).  Petitioner and/or Duncan then asked Mr. Loewenberg for the names of attorneys with whom he was familiar; however, Loewenberg advised that they could still use their Miami contact if he was willing to serve as their counsel.  (Id.).  Eventually, Mr. Loewenberg gave the men the names of two defense attorneys with whom he previously had worked.  (Id.).  On such person was Stephen Joseph, Esquire.  (Id.).

On January 13, 2006, Petitioner and Duncan hired Mr. Joseph to represent them in the negotiation of their cooperation agreements with the Government and their anticipated charges.

4

(Id.). Shortly thereafter, the parties reached an agreement to meet in Costa Rica in February

2006 for the debriefing. (Id.). However, on January 30, 2006, Agent Gonzalez was told during a

conversation with Mr. Joseph that Petitioner and Duncan had changed their minds about

continuing to cooperate and did not believe that authorities had learned their true identities.

(Doc. No. 4-6). In fact, as of November 2005, Agent Gonzalez already had associated Duncan

with the scheme; during a subsequent conversation with the men, Agent Gonzalez heard one

refer to the other as "Al"; and on another occasion the men made reference to Al's Canadian

origin. (Id.). As a result, Agent Gonzalez already had determined that "Al" was "Donald

Alfred Duncan." (Id.). Similarly, at some point before February 2006, Agent Gonzalez had

placed Petitioner's name on a list of possible participants in the scheme. (Id.). Attorney Joseph

did not identify the men for authorities. (Id.).

In any event, Petitioner and Duncan again changed their minds and were debriefed by

Agent Gonzalez, Mr. Loewenberg and other authorities in Costa Rica on February 22-23, 2006.

(Doc. No. 1-2). Attorney Joseph and two other lawyers from his firm were present for those

sessions. (Id.). During those sessions, Petitioner and Duncan stated, among other matters, that

they had participated in the sweepstakes fraud and had owned their own operation, but denied

that they had been paid for passing their operation along to David Hennessy. (Criminal Case No.

3:07cr43, Doc. No. 14). Such meetings concluded with Attorneys Joseph and Loewenberg

agreeing that Petitioner and Duncan could provide very valuable information and testimony in

the Government's sweepstakes fraud case; that the attorneys would attempt to work out a plea

agreement for the men; and that the men could continue to voluntarily provide information to

authorities but would not be acting as agents of the Government until their plea agreements were

in place. (Doc. No. 1-2). Following those sessions, Petitioner and Duncan continued to

5

voluntarily work with authorities and provided additional sources of evidence of the targeted sweepstakes operations.  (Id.).

In March 2006, the Government filed criminal complaints and secured arrest warrants for seven other individuals who were targeted by their investigation.  (See Criminal Case No. 3:06cr151).  David Hennessy was one such individual.  (Id.).  On May 5, 2006, the Government indicted 13 individual on various fraud and false statement charges in connection with the sweepstakes scheme.  (Id., Doc. No. 12).

Between mid April and May 2006, Mr. Joseph and Mr. Loewenberg agreed on a plea offer for Petitioner and Duncan.  (Doc. No. 1-2).  However, Loewenberg expressed concern about Mr. Joseph's joint representation; therefore, Petitioner retained James Wyatt, Esquire, to represent him in connection with his Plea Agreement and entry of his guilty plea.  (Criminal Case No. 3:06cr373, Doc. No. 27: Transcript of Plea at 17).  On August 31, 2006, the Government filed an Information charging Petitioner and Duncan with a single count of conspiring to defraud United States citizens, including a resident of Boone, North Carolina, by their sweepstakes fraud, all in violation of 18 U.S.C. § 371.  (Id., Doc. No. 1).  On September 4, 2006, Petitioner and Duncan were again debriefed by authorities in Charlotte, NC, at which time they reiterated that they had not received any payment from Hennessy for transferring their call center to him.

On September 5, 2006, the Government filed an Amended information, deleting any mention of the amount of proceeds that were obtained as a result of the fraud and changing the allegations concerning the overt acts that were committed by the conspirators.  (Id., Doc. No. 4).  Also on September 5, 2006, the parties filed their Plea Agreement, thereby memorializing the terms of their negotiations.  (Id., Doc. No. 6).  Such Agreement provides that Petitioner would

6

plead guilty to the conspiracy charge and be subject to, <u>inter alia</u>, a statutory maximum term of five years, a fine of $250,000 and an order of restitution. (<u>Id.</u> at 1). The Agreement further sets forth Petitioner's stipulations that the amount of loss that was known or reasonably foreseeable by him was in excess of $400,000 but less than $1,000,000; and that his total adjusted offense level for the offense was 30. (<u>Id.</u> at 2-3). That adjusted offense level included a three-level enhancement based upon the role that Petitioner played in the offense, a two-level vulnerable victim enhancement, and a four-level enhancement due to the large number of victims that were involved in the offense. (<u>Id.</u> at 3). Concerning his appellate and post-conviction rights, the Agreement contains Petitioner's waiver of his right to directly appeal or collaterally attack his Judgment in any manner and on any grounds, except that he reserved his right to challenge his sentence if it was imposed above the Guidelines range corresponding to offense level 30, and to challenge the Court's determination of his criminal history category. (<u>Id.</u> at 10). The Agreement was signed by the prosecutor, Petitioner, Mr. Wyatt and Mr. Joseph. (<u>Id.</u> at 11-12).

The Court also conducted Petitioner's Plea and Rule 11 hearing on September 5, 2006. At the outset of that proceeding, the Court placed Petitioner under oath and asked him questions to determine whether he fully understood the nature of the proceedings and the consequences of the proceeding. (<u>Id.</u>, Doc. No. 27: Transcript of Plea Hearing at 5-7). Thereafter, the Court engaged Petitioner in a lengthy colloquy to ensure that he was freely and intelligently entering his guilty plea. Petitioner's answers to the Court's questions established, <u>inter alia</u>, that he had received a copy of the charge, had discussed its contents with his attorney, and he understood the charge along with its elements and corresponding penalties. (<u>Id.</u> at 7, 9-12). Said answers also established that Petitioner and counsel had discussed the Guidelines and how the Court might apply them to his case. (<u>Id.</u> at 12-13). Petitioner expressed his understanding of the terms of his

7

Plea Agreement, including the rights he was relinquishing by virtue of the waiver provision set forth therein; and that if he received a sentence that was more severe than he was expecting, he still would have been bound by his pleas and would not have had the right to withdraw them. (Id. at 13-14, 17-19).

Petitioner also established that no one had threatened, intimidated or forced him to enter his guilty pleas, and no one had made him any promises of leniency in order to induce those pleas. (Id. at 20). Petitioner indicated that he was tendering his guilty plea because he was guilty of the subject charge, he wanted to plead guilty, and he wanted the Court to accept his pleas. (Id. at 6, 15-16). Furthermore, Petitioner established that he was satisfied with the services of his attorney and did not wish to make any statement about counsel's performance. (Id. at 21). Last, the record reflects that Petitioner remained silent when Mr. Wyatt affirmed to the Court that he had reviewed the terms of the Plea Agreement with Petitioner and was satisfied that Petitioner understood those matters, and when Wyatt entered Petitioner's formal guilty plea on the record. (Id. at 22-23). Consequently, after considering all of Petitioner's answers, the Court determined that his guilty plea was being knowingly and voluntarily tendered, and accepted the plea. (Id. at 23).

However, on February 28, 2007, an Indictment was filed charging Petitioner with two counts of making false statements to federal agents during the course of their investigation of his sweepstakes fraud. (Criminal Case No. 3:07cr48, Doc. No. 14). Such charges were premised on Petitioner's deception in reporting that he had not received any benefit from selling his sweepstakes business when, in fact, he had been paid thousands of dollars for it. (Id.). Petitioner then hired a third attorney, Monroe Whitesides, Esquire, to represent him on the new charges. (Id. at 16). However, after the Court granted Mr. Whitesides' Motion to Withdraw,

8

(Id., Doc. Nos. 21 and 22), on June 12, 2007, it appointed Pili Fleming for Petitioner. (Id., Doc. No. 27).

On September 4, 2007, Petitioner filed a second Plea Agreement by which he agreed to plead guilty to the false statement violation charged in Count Two from the second case. (Id. Doc. No. 30). Such Agreement is similar to the first in that it explains the statutory penalties that corresponded with Petitioner's conviction. (Id. at 1). However, this second Agreement does not contain the parties' stipulation to a specific offense level; it contains a waiver provision that allows Petitioner to contest that conviction and/or sentence on the grounds of ineffective assistance of counsel and prosecutorial misconduct; and it reflects his agreement to have his cases consolidated for sentencing. (Id. at 6, 8-9). Also on that date, the Court held Petitioner's Plea & Rule 11 hearing, during which it conducted a plea proceeding that was similar to his first one. Petitioner, once again, swore that he had discussed the charge and penalties with his attorney, he understood those matters and the elements of that offense, he and counsel had discussed how the Sentencing Guidelines might apply to his case, he understood his inability to withdraw his guilty plea on the ground that his sentence was more severe that expected, he understood and agreed to the terms of his Plea Agreement, and understood the rights that he was relinquishing, he was guilty of the charge and wanted the Court to accept his plea, no one had either threatened him or made any promises of lenience to induce his guilty plea, and he was satisfied with counsel's services. (Id., Doc. No. 34 at 3-13).

On December 10, 2007, Ms. Fleming filed a Motion to Withdraw as Counsel on the ground that Petitioner was attempting to retain new counsel, he planned to represent himself until he retained replacement counsel, and their communication had broken down, leaving her unable to zealously represent him. (Case No. 3:06cr373, Doc. No. 28). On December 12, 2007,

9

the Court held Petitioner's Factual Basis and Sentencing hearing at which time it addressed each of Petitioner's complaints against his attorney. After his discussion with the Court, Petitioner stated that he was "more comfortable" with his counsel and did not want to replace her or to withdraw his guilty plea; therefore, the Court denied the Motion to Withdraw. (Id., Doc. No. 40: Sentencing Transcript at 2, 16–25). The Court next expressed its great skepticism about accepting Petitioner's Plea Agreement but ultimately approved it. (Id.). At the conclusion of that hearing, the Court sentenced Petitioner to consecutive 60-month terms of imprisonment for his two convictions. (Id. at 58-59). The Court's Judgment was filed on January 3, 2008. (Id., Doc. No. 35-2).

Before the Court's Judgment was filed, however, Petitioner filed a pro-se Notice of Appeal on December 18, 2007. (Id., Doc. No. 31). Thereafter, on January 24, 2008, Petitioner filed a pro-se Motion to Dismiss/Withdraw Appeal (Id., Doc. No. 37), and on February 28, 2008, the Fourth Circuit Court of Appeals granted that Motion and dismissed said appeal. (Id., Doc. No. 38).

On December 10, 2008, Petitioner filed the instant Motion to Vacate alleging that Ms. Fleming was ineffective because she failed to timely file a notice of appeal and failed to consult with him about his appellate rights; that Mr. Joseph (his first attorney) was ineffective because he had a conflict of interest with Petitioner; and that his Sixth Amendment right to counsel was violated by the Government's intrusion into his relationship with Mr. Joseph. (Doc. No. 1 at 4-5). Petitioner attached an unsworn declaration to his Motion, purporting to support his allegations. (Doc. No. 1-1).

On June 5, 2009, the Government filed a Response denying Petitioner's allegations and arguing that he is not entitled to any relief on his claims. (Doc. No. 4). In particular, the

10

Government argues that Petitioner's claim against Ms. Fleming is baseless because he had an appeal but voluntarily withdrew it; that his claim against Mr. Joseph essentially is belied by the record; and that his claim of Government intrusion also is baseless. (Id. at 9-25). Thus, the Government asks the Court to summarily dismiss Petitioner's case. The Government's Response has several attachments, including Affidavits from Ms. Fleming and Agent Gonzalez. (Doc. Nos. 4-2 and 4-6). Accordingly, the Court construed the Response as a de facto motion for summary judgment, and on August 24, 2010, it entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) (Doc. No. 5). That Order advised Petitioner of the rules pertaining to the summary dismissal of his case and of his obligation to file his own documents in opposition to the Government's evidentiary forecast. (Id.).

On September 28, 2010, Petitioner filed a Reply/Response to the Government's pleading, essentially reiterating his claims but failing to rebut the Government's evidentiary proffer. (Doc. No. 6). Last, Petitioner has filed two documents seeking to amend his Reply. (Doc. Nos. 7 and 8). By his first proposed amendment, Petitioner essentially advises that he was in the process of obtaining a final statement from a high ranking Costa Rican law enforcement agent to establish that such agent trusted Petitioner and his co-defendant to work with the agent's subordinates during their investigation of the sweepstakes fraud; and that Petitioner's false statement to authorities – that he gave away his illegal sweepstakes business when, in fact, he sold that business for profit – would not have deterred the agent from using Petitioner after that time. (Doc. No. 7 at 1-2). Petitioner attached a draft of the anticipated statement to his Motion to Amend. (Doc. No. 7-1). Notably, such exhibit is an unsigned letter addressed "to whom it may concern," reportedly from the head of the Regional Delegation of Guanacaste Province of Costa Rica. (Id.). Such letter thanks Petitioner for his help with identifying and dismantling a

11

criminal network that consisted of a group of foreign persons who were operating an international scam in Costa Rica; and it asks that Petitioner's cooperation be taken into account. (Id. at 1-2). Petitioner's second Motion to Amend (Doc. No. 8) still does not include the actual signed letter from any official but merely reports to be "another draft" of his prior exhibit (Doc. No. 7-1). Indeed, although this letter appears to be on official government letterhead, it does not bear the author's signature. (Doc. No. 8-1). Petitioner's Motion indicates that he was submitting that unsigned letter "while awaiting a signed, stamped copy from Costa Rica." (Doc. No. 8 at 1).

Finally, the Court notes that nearly one year has passed, yet no such letter has ever been filed by Petitioner. Accordingly, Petitioner's case is ripe for resolution.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, and answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>accord</u> <u>Sylvia Dev.</u>

12

Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any

inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477

U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658,

2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

The Court has reviewed the Government's de facto motion for summary judgment (Doc.

No. 4) as well as the entire record of this case and has concluded that it is entitled to judgment as

a matter of law. Accordingly, for the reasons stated herein and for the further reasons set forth in

the Government's motion, Petitioner's Motion to Vacate must be denied.

## III. DISCUSSION

### A. Petitioner's claim of ineffective assistance of counsel against Attorney Fleming is factually and legally baseless.

The Supreme Court has provided the test for determining whether a defendant received

adequate assistance of counsel.

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced
> the defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.

Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Unless a defendant makes both showings, his claim of ineffective assistance of counsel must

fail. Id. To obtain relief on a claim of ineffective assistance of counsel following the entry of a

guilty plea, a petitioner must show that counsel's performance fell below objective standards of

13

reasonableness, and, that but for his conduct, there was a reasonable probability that he would not have pleaded guilty but would have insisted on going to trial. Id., at 688; Bustos v. White, 521 F.3d 321, 324 (4th Cir. 2008) (applying Strickland standard to defendant who entered plea agreement) (citations omitted). The Fourth Circuit has explained that "[t]his is an objective inquiry and dependent on the likely outcome of a trial had the defendant not pleaded guilty." Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (citations omitted).

In reviewing claims of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. Indeed, the Court must make "every effort . . . to eliminate the distorting effects of hindsight," operating, instead with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. A petitioner bears the burden of proving Strickland prejudice and if he fails to do so "a reviewing court need not consider the performance prong." Fields v. Attorney Gen. of State of Md., 956 F.2d 1290, 1297 (4th Cir. 1992).

Here, Petitioner claims that after he was sentenced, he advised Ms. Fleming that he wanted to talk about his appeal; however, he never again heard from her. Thus, Petitioner argues that Fleming was ineffective for failing to timely file a notice of appeal and failing to consult with him regarding that appeal. Curiously, Petitioner does not ask that the Court impose a new Judgment in order to give him the opportunity to file an appeal. In fact, Petitioner gives no indication of the remedy that he is seeking for this alleged violation of his rights.

Furthermore, Ms. Fleming's Affidavit asserts that after sentencing but before they left the courtroom, she asked Petitioner if he wanted to appeal and he said that he did not. (Doc. No. 42). Such Affidavit further asserts that after Ms. Fleming learned that Petitioner actually had

filed a Notice of Appeal, she visited him at the jail to explain the Judgment and inquire about his desire for a appeal; however, Petitioner again advised that he did not want to appeal. (Id.). Thus, after Petitioner filed a pro-se Motion to Withdraw his appeal with this Court, Fleming properly filed a Motion to Dismiss in the appellate Court. (Id.). Ms. Fleming's Affidavit is supported, in part, by the Jail records that she submitted reflecting that she made a post-judgment visit with Petitioner. (Id.). Accordingly, Petitioner's contention that counsel failed to consult with him is belied by the record. See Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000).

Equally critically, the record reflects that six days after his Sentencing hearing – but before the Court entered its final Judgment in the case – Petitioner filed his own pro-se Notice of Appeal with this Court. (Doc. No. 37). Pursuant to Rule 4(b)(2) of the Federal Rules of Appellate Procedure, if a notice of appeal is filed after the court announces its sentence but before the entry of the judgment, such notice is "treated as filed on the date of an after entry" of said judgment. Therefore, there simply was no need for counsel to file another notice of appeal. Rather, as the record also makes clear, Petitioner's Notice was, in fact, sufficient to protect his appellate rights as this Court transmitted the Notice to the Fourth Circuit Court of Appeals, and that Court opened an appellate case for Petitioner. See United States v. Barker, No. 08-4073 (4th Cir. 2008). The appellate Court also appointed Ms. Fleming to represent Petitioner. Id. (Doc. Nos. 1, 3 and 5). Nevertheless, Petitioner subsequently filed a pro-se Motion to Dismiss/ Withdraw Appeal in this Court and, in turn, Ms. Fleming filed a Motion to Dismiss with the Court of Appeals. Id., Doc. No. 9; and Case No. 3:07cv48, Doc. No. 41. After obtaining the Government's consent to the dismissal, the Court of Appeals granted the Motion and dismissed Petitioner's appeal. Barker, No. 08-4073 (4th Cir. 2008, Doc. Nos. 11-12). Thus, Petitioner's claim must be denied because he was not denied his right to an appeal.

15

**B.      Petitioner's claim against Mr. Joseph also is baseless**.

By his second claim, Petitioner contends that Mr. Joseph, his first attorney, was ineffective due to a conflict of interest caused by his joint representation of Petitioner and his co-defendant during the parties' pre-trial plea negotiations.  Apart from the fact that Petitioner waived all rights to challenge the Judgment from this case unless his sentence exceeded 60 months or he disagreed with the Court's criminal history calculations, the Court finds that the claim has no merit.[2]

The Sixth Amendment right to effective assistance of counsel includes a duty of loyalty by counsel that requires the attorney to remain free of conflicts of interest. See Strickland, supra, 466 U.S. at 688.  Nevertheless, the mere "possibility of conflict [of interest] is insufficient to impugn a criminal conviction."  Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  Indeed, the potential for a conflict "may not, in practice, contravene this duty of loyalty."  Stephens v. Branker, 570 F.3d 198, 208 (4th Cir. 2009).  In order to prevail on such a claim, a defendant must show both that his attorney labored under an actual conflict of interest and that such conflict adversely affected counsel's performance.  Mickens v. Taylor, 535 U.S. 162, 170-71 (2002).  To establish the existence of an actual conflict of interest, the petitioner "must show that [his] interests 'diverge[d] [from his attorney's] with respect to a material factual or legal issue or to a course of action.'" Stephens, 570 F.3d at 209 (quoting Gilbert v. Moore, 134 F.3d 642, 652 (4 th Cir. 1998) (en banc) (alterations in original)).

---

[2] Notwithstanding whether such waiver can bar the Court's review of this claim, the Court finds that it should entertain this allegation.  Indeed, Petitioner's claim that he received ineffective assistance of counsel during the negotiation of his Plea Agreement necessarily implicates the validity of that Agreement.  Therefore, the Court finds that the interests of justice would be served by determining whether Petitioner's rights were adequately protected during those negotiations, thereby rendering the waiver provision valid and enforceable.

While the instant record shows that Mr. Joseph represented both Petitioner and his co-defendant during the pre-trial stages of their first case, it also shows that prior to the time that Petitioner signed and filed his Agreement with the Court, he retained the assistance of his own separate attorney, James Wyatt; and that Mr. Wyatt personally reviewed the terms of that Agreement with Petitioner and approved of them. (Criminal Case No. 3:06cr373: Transcript of Plea hearing at 7, 12 and 17-18). Furthermore, the record shows that Petitioner was represented by Mr. Wyatt during his Plea and Rule 11 hearing, at which time Petitioner told the Court that he was satisfied with Wyatt's services. (Id. at 21). In addition, the record shows that Petitioner and his co-defendant both pled guilty and received identical punishments for their convictions. (Doc. No. 33: Judgment; Criminal Case No. 3:07cr49, Doc. No. 19: Judgment). Thus, the Court can discern no actual conflict from these facts.

Moreover, Petitioner does not assert that his interests diverged with counsel's with respect to any matters in his proceedings. Nor has Petitioner even attempted to identify a plausible alternative defense strategy or tactic that Mr. Joseph might have pursued but for his initial negotiation of both Petitioner and Duncan's Plea Agreements. See United States Nicholson, 475 F.3d. 241, 250 (4th Cir. 2007) (To establish an adverse effect, a petitioner must meet, by a preponderance of the evidence, three requirements, including "identify[ing] a plausible alternative defense strategy or tactic that his defense counsel might have pursued."). In sum, Petitioner's Plea Agreement was reviewed and approved by his own separate attorney, thereby removing the possibility that he was subjected to a conflict of interest; and his failure even to suggest that Mr. Joseph's performance was adversely affected by the parties' arrangement prevents him from showing that he was prejudiced in any event.

Furthermore, to the extent that Petitioner is complaining that Mr. Joseph misled him

concerning the circumstances of his cooperation or otherwise was ineffective in his handling of their debriefings, Petitioner is not entitled to review of such allegations. The law is well-established that a knowing and voluntary waiver of the right to collaterally challenge a conviction or sentence is valid and enforceable. United States v. Lemaster, 403 F.3d 216, 221–22 (4th Cir.2005). As Mr. Wyatt pointed out to the Court during the Plea hearing, under the terms of Petitioner's first Plea Agreement – the only case with which Mr. Joseph had any connection – he waived his right to bring this type of challenge. (Criminal Case No. 3:06cr373, Doc. No. 27: Transcript of Plea Hearing at 18-19). Moreover, unlike the question of whether Petitioner received ineffective assistance of counsel in connection with the negotiation of the Plea Agreement itself, the interests of justice simply are not served by the Court setting aside the waiver to determine whether counsel was ineffective in his handling of Petitioner's cooperation. Therefore, this portion of the claim is barred.

> **C.    Petitioner's claim of Government intrusion is barred**.

Petitioner claims that the Government violated his Sixth Amendment rights when the prosecutor intruded into his relationship with Mr. Joseph by deceiving him into believing that Mr Joseph was going to represent Petitioner and his co-defendant and then using Joseph as an agent to obtain information against them. However, Petitioner is not entitled to any relief on this claim.

First, this claim, as like Petitioner's miscellaneous allegations against Mr. Joseph, is expressly barred under the waiver provision in his Plea Agreement. Once again, the Court does not find that the interests of justice would be served by entertaining the allegation. Therefore, Petitioner's waiver stands as a bar to the Court's review. Lemaster, supra, 403 F.3d at 221-22.

Second, even if the claim is not barred by waiver, it is defaulted due to Petitioner's

18

failure to raise it on direct appeal.  That is, claims that could have been but were not raised on direct review are procedurally barred.  United States v. Pettiford, 612 F.3d 270, 280 (4th Cir.) cert. denied, 131 S.Ct. 620 (2010).  "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal."  Bousely v. United States, 523 U.S. 614  (1998) (citation and internal quotation marks omitted).  Thus, in order to collaterally attack a conviction or sentence based upon errors that could have been but were not raised on direct appeal, a petitioner must show both cause to excuse his default and actual prejudice resulting from the errors of which he is complaining, or he must demonstrate that a miscarriage of justice would result from the court's refusal to consider his claim.  United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999) (citing United States v. Frady, 456 U.S. 152, 170 (1982).

Petitioner has not alleged any matter that could arguably demonstrate cause and prejudice or miscarriage of justice in order to excuse his procedural default.  Consequently, his claim of Government intrusion must be dismissed as it is barred by waiver and is procedurally defaulted without excuse.

**D.     Petitioner will not be permitted to supplement his Response**.

Rule 15 f the Federal Rules of Civil Procedure governs the procedure for supplementing pleadings.  The Rule provides that upon reasonable notice, "the Court may permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."   Fed. R. Civ. P. 15(d).

As has been noted, Petitioner's proposed supplements (Doc. Nos. 7 and 8) do not rebut the Government's evidentiary forecast.  Indeed, such unsigned draft letters suggest only that Petitioner was helpful in Costa Rica's investigation into the subject offenses; that his deception

did not deter the author's willingness to work with Petitioner; and that Petitioner's cooperation should be taken into consideration. Accordingly, it would be futile to allow Petitioner to supplement his Response to include the foregoing information.

## IV. <u>CONCLUSION</u>

Certain of Petitioner's allegations are barred by his waiver of them and/or his procedural default. Moreover, Petitioner has failed to forecast any evidence to show that there is a genuine issue of material fact to be resolved in a trial or that he is entitled to relief on any of his claims. Therefore, the Government's Motion for Summary Judgment will be granted, and Petitioner's Motion to Vacate will be denied and dismissed.

## V. <u>ORDER</u>

**IT IS, THEREFORE, ORDERED THAT:**

1. Petitioner's <u>de facto</u> motions to supplement his Reply (Doc. Nos. 7 and 8) are **DENIED**;

2. The Government's <u>de facto</u> motion for summary judgment (Doc. No. 11) is **GRANTED**;

3. Petitioner's Motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence (Doc. No. 1) is **DENIED** and **DISMISSED;** and

4. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has failed to make a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted).

**SO ORDERED**.

Signed: November 16, 2011

Graham C. Mullen
United States District Judge

21